# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed:  November 18, 2022

```
* * * * * * * * * * * * * * * * * * * *
MARY M. SCHOELLER,            *              Unpublished
                              *
            Petitioner,       *
                              *              No. 17-111V
v.                            *
                              *              Special Master Gowen
                              *
SECRETARY OF HEALTH           *              Decision on Damages;
AND HUMAN SERVICES,           *              Shoulder Injury.
                              *
            Respondent.       *
* * * * * * * * * * * * * * * * * * * *
```

*John F. McHugh,* Law Office of John McHugh, New York, NY, for petitioner.
*Tyler King,* U.S. Dept. of Justice, Washington, D.C., for respondent.

## DECSION ON DAMAGES[1]

On January 25, 2017, Mary M. Schoeller ("petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program.[2]  Petition (ECF No. 1).  Petitioner alleged that she suffered an injury to her left shoulder as a result of receiving the measles-mumps-rubella ("MMR") vaccination on February 11, 2014.  Amended Petition (ECF No. 68).  A Ruling for Entitlement was issued on June 28, 2022, finding that petitioner is entitled to compensation for her left shoulder injury after receiving the February 11, 2014 MMR vaccine.  Since that time, the parties have been unable to resolve damages in this case.

For the reasons set forth below, I find that petitioner is entitled to an award of damages in the amount of $72,000.00 for actual pain and suffering and $2,011.32 for past unreimbursable medical expenses.

---

[1] Pursuant to the E-Government Act of 2002, see 44 U.S.C. § 3501 note (2012), **because this opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.**  The Court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7.  Before the opinion is posted on the Court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).  An objecting party must provide the Court with a proposed redacted version of the opinion.  *Id.*  **If neither party files a motion for redaction within 14 days, the opinion will be posted on the Court's website without any changes.**  *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.      Relevant Procedural History

The Ruling on Entitlement provides a procedural history from the time petitioner filed the petition until the Ruling on Entitlement, and that procedural history is incorporated herewith in and shall not be repeated.

After I issued the Ruling on Entitlement, finding that petitioner was entitled to compensation, the parties engaged in unsuccessful settlement discussions.  On October 11, 2022, both parties filed status reports.  *See* Petitioner ("Pet.") Status Report ("Rept.") (ECF No. 95); Respondent's ("Resp.") Status ("Rept.") (ECF No. 94).  Petitioner's status report stated that respondent had sent petitioner a proffer, which petitioner rejected.  Pet. Status Rept.  On October 24, 2022, I held a status conference where the parties indicated that they were unable to reach an agreement on damages, specifically on the amount for pain and suffering.  Scheduling Order (ECF No. 97).  The parties requested that the Court resolve damages and sought to file short memorandums in support of their respective positions.  *Id.*

On November 11, 2022, petitioner filed a memorandum on damages.  Pet. Memo (ECF No. 98).  Petitioner also filed additional documentation to support her out-of-pocket medical expenses.  Pet. Exhibit ("Ex.") 21.  Respondent filed a responsive memorandum on damages on November 14, 2022.  Resp. Memo (ECF No. 99).

This matter is now ripe for adjudication.

## II.      Relevant medical history

A complete recitation of the facts can be found in the Finding of Fact and will not be repeated here.  *See* Finding of Fact (ECF No. 86) at 4-7.

In brief, petitioner received the MMR vaccination in the upper portion of her left arm on February 11, 2014.  Pet. Ex. 2 at 4; Pet. Ex. 11 at ¶ 4.  The MMR vaccine is intended to be administered subcutaneously.  *Id.*  In the Finding of Fact, I found that the "facts demonstrate by preponderant evidence that the MMR vaccine administered to petitioner on February 11, 2014 was inadvertently administered into or around petitioner's subdeltoid bursa, causing pain and shoulder dysfunction."  Finding of Fact at 12-13.

In her affidavit, petitioner stated that the day after the vaccination, she was "experiencing much more pain than I should for an MMR vaccine."  Pet. Affidavit ("Aff.") at ¶ 8.  She also stated that her shoulder pain remained constant throughout February and March, until she finally sought care in April.  *Id.* at ¶ 10.  She also testified that the day following the vaccination, she had difficulty putting her jacket on and that her left arm was "really sore."  Tr. 8-9.  Petitioner's husband testified that he remembered that petitioner was complaining of arm pain the day following the vaccination.  Transcript ("Tr.") 40.

Petitioner testified that her left arm soreness continued "for a while."  Tr. 8.  She stated that she thought that her shoulder would be sore for "a couple of days."  *Id.*  However, she

testified that the soreness went on for "a couple of months." Tr. 9.  Petitioner stated that after a family swim night in April 2014, she was unable to "get [her] shoulder over to swim, and I decided at that point I should go see the doctor, as it was starting to interfere with my life."  *Id.*

On April 15, 2014, petitioner had an appointment with Dr. Gail Carels, where she reported that she was having shoulder pain since the MMR vaccination she received on February 11, 2014.  Pet. Ex. 3 at 5.  Petitioner also reported that ibuprofen helped relieved some of the symptoms, but that applying heat did not.  *Id.*  Dr. Carels recorded that petitioner had "shoulder point tenderness biceps insertion" and assessed petitioner with "shoulder strain, biceps tendonitis?"  *Id.* at 5.  It was recommended that petitioner use non-steroidal anti-inflammatory medication, exercise, and seek treatment from an orthopedist if her shoulder pain did not improve."  *Id.*  Petitioner testified that Dr. Carels gave her "some exercises to do," and if her shoulder pain did not clear up in a month, to contact Dr. Carels again.  Tr. 9.

On May 5, 2014, petitioner sent Dr. Carels a message.  Pet. Ex. 3 at 40.  Specifically, petitioner wrote that she was "Following up on her left shoulder issue.  It does seem to be somewhat better, but not totally gone….There are certain things that still bother it, and sometimes when I wake up it is sore-probably from sleeping on it."  *Id.*  Petitioner explicitly stated that she wanted "to wait a couple more weeks before going to an orthopedist," but asked the following questions: "1) Should I continue to take Naproxen? 2) Should I be avoiding activities?  For example, I haven't been doing boxing or karate on the Wii Fit.  But should I avoid things such as picking up my son, or anything else that might aggravate it.  I never realized how much I use my left arm until I tried to avoid using it."  *Id.* at 40.  Dr. Carels responded that petitioner can "continue to use Naproxen for another week," and that petitioner should "avoid the karate and boxing activities, but continue your usual activities such as lifting your son, etc."  *Id.*

On August 1, 2014, petitioner sent another electronic message to Dr. Carels stating that she was "still having issues with my shoulder that have never resolved-probably about 90% better but still certain activities that make it hurt….Wondering if I should try taking Naproxen again for a week, or if it's time for an orthopedic referral; I have seen Dr. Obma in the past."  Pet. Ex. 3 at 39.  Dr. Carels wrote back to petitioner the same day, referring petitioner to an orthopedist for her left shoulder.  *Id.* at 38.

Petitioner had an appointment with Dr. Rory Obma on August 8, 2014.  Pet. Ex. 3 at 21.  At this appointment, petitioner reported that her left shoulder pain as a 4 out to 5 out of 10.  *Id.*  Additionally, Dr. Obma recorded that petitioner had "progressive left shoulder pain since she had the MMR vaccine done at work."  *Id.*  Under "Review of Systems" it noted that petitioner was "positive for joint pain and muscle pain."  *Id.* at 23.  Petitioner demonstrated a slight reduction of motion upon active forward flexion with her left shoulder and she had a "painful arc on the left, negative on the right."  *Id.*  Dr. Obma's impression was that petitioner "likely developed a mild adhesive capsulitis after [the] MMR injection and now she has some inflammation there as well."  *Id.*  He recommended that petitioner have physical therapy to improve her range of motion and gave her a prescription for Naprosyn to take as necessary.  *Id.*

Petitioner began physical therapy for her left shoulder on August 19, 2014.  Pet. Ex. 3 at 142.  The location of pain was documented as being in the "lateral aspect of [petitioner's] left

arm/shoulder," and it was a 5 out of 10 at its worst and 0 out of 10 at best. *Id.* Petitioner described the pain as "sharp, tight," and aggravating factors were "reaching behind her, throwing or hitting a ball with her left arm, leaning on her left elbow, swimming, sleeping on her left side." *Id.* The physical exam demonstrated she had reduced range of motion of her left shoulder compared to her right. *Id.* at 143. For example, her abduction was 115 degrees on her left, but 125 degrees on her right and her external rotation was recorded as 0-76 degrees on her left and "within normal limits" on her right. *Id.* Additionally, the physical therapist noted that petitioner had tightness on her posterior capsule with passive joint mobility testing. *Id.* Petitioner also had slight weakness in her left shoulder compared to her right and tenderness to palpitation at her supraspinatus and infraspinatus insertion. *Id.* The assessment was that petitioner had "signs and symptoms consistent with decreased left shoulder mobility and supraspinatus strength." *Id.* at 142. The problem list included "decreased left shoulder flexibility, shoulder strength and range of motion," as well as, "Limited functional ability to complete reaching, sleeping on left side, throwing/playing ball with left arm, leaning on left arm." *Id.* at 143.

Petitioner participated in physical therapy for seven sessions. Pet. Ex. 3 at 149-159. On September 8, 2014, petitioner reported that her shoulder was feeling "a lot better," with occasional "twinges of pain with end range movement, but the pain subsides quickly." Pet. Ex. 3 at 153. By September 12, 2014, petitioner reported that she had "some soreness with moving [her] arm up overhead, but denies any pain." *Id.* at 156. Additionally, petitioner reported that her discomfort subsided as soon as she moved the arm back to her side. *Id.* As a physical therapy appointment on September 19, 2014, petitioner reported a "slight increase in her shoulder pain/aching," and did not know if was because she lifted her son up at a football game or because of physical therapy. *Id.* at 157. She continued to have tenderness to palpation at the RC insertion and at the anterior lateral shoulder. *Id.* at 157. Under "Assessment," it was recorded that "petitioner feels ready to continue with her exercises on her own." *Id.* at 159.

Petitioner had a follow-up appointment with Dr. Obma on September 22, 2014. Pet. Ex. 3 at 21. At this appointment, the chief complaint was listed as "Left shoulder pain." *Id.* Under "History of Present Illness," it was recorded that petitioner's left shoulder pain "initially [began] after having an MMR vaccine." *Id.* Further, the note states that petitioner "reports she is about 90-95%, still with some reaching out abducting type activities," and that petitioner has some shoulder "discomfort" at a 3 to 4 out of 10. *Id.* Petitioner's physical exam showed that she had a decreased range of motion in her left arm with rotation behind her back. *Id.* Dr. Obma's impression was "resolving to resolved shoulder pain," and he recommended that petitioner do "home physical therapy," and gave her a prescription of Naprosyn to take as needed." *Id.* Petitioner testified that Dr. Obma released her and she continued to do home exercises for approximately six-months. Tr. 10. She stated that she continued to have some issues, so she sought a different orthopedic doctor to get a second opinion. *Id.*

After nearly one year, petitioner sought treatment from orthopedist, Dr. Shawn Hennigan, on August 12, 2015. Pet. Ex. 5 at 3. The date of injury was recorded as "2/11/2014." *Id.* Petitioner reported that her left shoulder pain began in February 2014 after she received a subcutaneous MMR vaccine. *Id.* Petitioner stated that her shoulder was "tight and sore," since the vaccination and the pain is centralized to the top of her shoulder. *Id.* Dr. Hennigan recorded that petitioner was seen by Dr. Obma in August 2014 and that he had recommended physical

therapy.  *Id.* at 4.  Petitioner reported that she had done "several months of physical therapy that has not helped," and that she has not received any injections.  *Id.*  During the physical exam of petitioner's shoulders, petitioner had pain to palpation over the anterolateral acromion of the left shoulder and it was recorded that her "acromioclavicular joints are painful on the left."  *Id.* at 5.  She had active forward flexion elevation to 160 degrees bilaterally and her external rotation was the same bilaterally as well.  *Id.* at 6.  Petitioner had positive Neers impingement and Hawkins tests on her left arm.  *Id.*  Petitioner was diagnosed with "left shoulder pain following work required vaccination (MMR) left deltoid; A.C. joint symptoms, subacromial pain."  *Id.*  Dr. Hennigan recommended petitioner have an MRI of her shoulder.  *Id.*  Dr. Hennigan wrote that petitioner "has been through a reasonable conservative management to date including physical therapy and anti-inflammatory medications, with no significant improvement."  *Id.* at 7.

On August 26, 2015, petitioner had an MRI of her left shoulder.  Pet. Ex. 20.  The MRI revealed petitioner had a mild increased T2 signal in the distal supraspinatus consistent with tendinopathy, but no rotator cuff tear; subtle increased T2 signal intensity in the superior labrum that was suspected intrasubstance degeneration or non-displaced tearing; and trace fluid was seen in the subacromial/subdeltoid space.  *Id.* at 1-2.

Petitioner had an appointment with Dr. Hennigan on August 26, 2015, to review her MRI.  Pet. Ex. 5 at 10.  Dr. Hennigan wrote, "In reviewing the study, there is significant subdeltoid fluid in the bursa.  There is a lateral acromion spur, small anterior inferior acromion spur, marked A.C. joint arthrosis, supraspinatus tendinosis, but no significant tear, and probable displaced SLAP tear noted."  *Id.*  Dr. Hennigan's impression was, "Exacerbation of left shoulder pain following MMR vaccination, a requirement for her employment."  *Id.* at 10.  Petitioner opted for a subacromial steroid injection and a physical therapy "refresher."  *Id.*  Petitioner testified that the cortisone injection did not help with her pain, but the second round of physical therapy did help.  Tr. 11.

Petitioner re-started physical therapy on August 31, 2015.  Pet. Ex. 6 at 4.  Under "Description of Onset," it was recorded that petitioner had an MMR injection on February 11, 2014, and that "in the next day or two shoulder was extremely sore," and that petitioner had a hard time reaching overhead or backward.  *Id.*  Additionally, petitioner reported that she had "waited too long to go to the doctor," and that she waited "a few months thinking it would go away."  *Id.*  Petitioner stated that she had participated in physical therapy, and she did stretching and strengthening exercises.  *Id.*  Petitioner explained that her pain had been reduced with prior physical therapy and that she improved approximately between 75-80%.  *Id.*  Additionally, she stated that her current pain level was a 3 out of 10, but in the last two weeks her pain was at a 7 out of 10.  *Id.*  Petitioner described that the pain was located in the anterior aspect of her left shoulder and characterized it as "strain, sore, ache."  *Id.*  Petitioner also explained that her functional limitations included swimming, playing with her son, walking her dogs, lifting heavy things, and carrying a heavy laptop bag.  *Id.*

On a physical examination, petitioner demonstrated reduced range of motion upon abduction and external rotation of her left shoulder, compared to her right.  Pet. Ex. 6 at 6.  She had a positive empty can test that was noted as "positive for supraspinatus tendinitis," and she

was positive for "left subscapularis tendinitis." *Id.*  Further, she was positive for "left anterior instability." *Id.*

Petitioner participated in seven physical therapy appointments. Pet. Ex. 6 at 6-49.  At one appointment on September 10, 2015, the physical therapist wrote that "patient is improving with decreased pain duration and good scapular control during exercise noted.  Pain after treatment: 0/10." *Id.* at 26.  Four days later, at another appointment, petitioner reported that she was recovering from soreness faster than before and her current pain level was a 0/10.  *Id.* at 31.  At an appointment on September 22, 2015, petitioner indicated that she was "able to quickly lift her left arm and catch a football without pain." *Id.* at 44.  Her last physical therapy appointment was on September 25, 2015, petitioner reported that her pain was a 2 out of 10.  *Id.* at 50.  It was noted that her active range of motion for her left shoulder was "within normal limits." *Id.*  The record indicated that petitioner had met her goals of physical therapy.  *Id.* at 51.

### III.   Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000." 42 U.S.C. § 300aa-15(a)(4).  With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition.  *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries. *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007).  In *Graves*¸ Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent". *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013).  Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap.  Only then as a second step, if the award would exceed $250,000, it must be reduced to that maximum.  *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[3]  However, they have found it to be persuasive.  *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed*

---

[3] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998).  In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

*v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach. I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). 2

## IV. Parties' arguments

### a. Petitioner's position

Petitioner requests an award "at the upper end" of $60,000.00-$90,000.00 or $80,000.00 in pain and suffering and $2,011.32 in past unreimbursable medical expenses. Pet. Mem. at 5. Petitioner argues that she had "18 months of significant disability due to pain which limited her use of her left arm." *Id.* at 4. Petitioner states that "immediately after the vaccination, she had a problem putting on or taking off her winter coat, could not lift heavy shopping bags, carry laundry baskets, box, play basketball or swim her child, and had issues walking the dog." *Id.* at 4.

Petitioner asserts that the *Dagen* case provides a range of $60,000.00 to $90,000.00 for pain and suffering that would be applicable to her case. Pet. Mem. at 4; *Dagen v. Sec'y of Health & Human Servs.,* No. 18-442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) In *Dagen,* Chief Special Master Corcoran explained that some SIRVA cases that are resolved in the Special Processing Unit ("SPU") by a decision on damages, compensation has been awarded in a range of $60,000.00 to $90,000.00. *Dagen,* at *7. Those cases that fall within that range include shoulder injuries with "good prognosis, albeit in some instances with some residual pain." *Id.* Further, *Dagen* explained that in those cases, petitioners often have "mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies, such as tendinosis, bursitis, or edema." *Id.* The duration of injury ranges from six to 29 months on average, and the petitioners experienced approximately fourteen months of pain. *Id.* Additionally, approximately half of petitioners who were awarded damages in this range, were administered one to two cortisone injections. *Id.*, at *8. Further, most of these petitioners pursued physical therapy for two months or less and none had surgery. *Id.* After reviewing the SPU SIRVA cases, the Chief Special Master awarded the petitioner in *Dagen* $65,000.00, reasoning that petitioner's injury was "less severe and a shorter duration than those injuries which have warranted higher awards for pain and suffering." *Dagen,* at *9-10. However, it is important to note that in *Dagen*, the award of $65,000.00 in pain and suffering was $7,500.00 higher than what respondent argued was an appropriate amount of compensation. *Id.*, at *5.

**b. Respondent's position**

Respondent avers that petitioner should be awarded $65,000.00 for pain and suffering. Resp. Mem. at 1. Respondent states that, "The evidence in this case indicates that petitioner's injury was relatively mild and limited in nature and duration." *Id.* Respondent notes that petitioner did not seek treatment for her left shoulder pain for "more than two months post-vaccination, demonstrating that the pain was tolerable for that period." *Id.* Respondent also argues that petitioner did not begin physical therapy for more than six months after the vaccination at issue, and that by the end of the first round of physical therapy, petitioner reported that she was feeling "90-95%" better. *Id.* at 3; *see also* Pet. Ex. 3 at 19. Respondent observes that petitioner had an eleven-month gap in treatment between her physical therapy in September 2014 and seeing Dr. Shawn Hennigan in August 2015. Resp. Mem. at 3.

Respondent argues that both the two-month delay in treatment and the "nearly eleven-month gap in treatment in this case is significant and supports a relatively lower pain and suffering award than other cases where petitioners promptly seek treatment and do not have lengthy gaps in care." *Id.* Respondent emphasizes that Chief Special Master Corcoran observed in *Shelton* that "the fact that petitioner could cope with her injury for such a long period of time counsels in favor of a lower pain and suffering award. Treatment gaps are a relevant consideration in determining the degree of petitioner's pain and suffering." *Id.* at 3; *Shelton v. Sec'y of Health & Human Servs.,* No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021). However, in *Shelton,* Chief Special Master Corcoran awarded petitioner an award of $97,500.00 in pain and suffering for a SIRVA. *Shelton,* at *1. In *Shelton,* the Chief Special Master found that petitioner's SIRVA injury was "moderate," and that during her course of treatment she reported that her pain level was "relatively low." *Id.,* at *7. However, unlike in

this case, the petitioner in *Shelton,* underwent an arthroscopic surgery on her affected shoulder. *Id.*, at *8.

Respondent also cites to *Knauss, Dagen,* and *Murray,* as comparable SIRVA cases that support an award of $65,000.00 in pain and suffering. Resp. Mem. at 4. Respondent states that the petitioner in *Knauss,* received an award of $60,000.00 for a SIRVA, where the pain was "on and off for two years, attended thirty physical therapy sessions, and received one steroid injection." *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018). Respondent states that the petitioner in *Daggen* had a "more severe course than petitioner in this case." Resp. Mem. at 4. As discussed above, the petitioner in *Dagen* was awarded $65,000.00 for pain and suffering, with the Chief Special Master explaining that the petitioner's pain was "fairly significant in the first two months post-vaccination, but progressively eased in the ensuing period, with her movement impairment also largely improved within seven months of vaccination." *Dagen,* at *10. Respondent also asserts that the petitioner in *Murray* "also suffered a more severe course than petitioner in this case," and was awarded $65,000.00 for a SIRVA. Resp. Mem. at 4; *Murray v. Sec'y of Health & Human Servs.,* No 18-534V, 2020 WL 4522483 (Fed. Cl. Spec. Mstr. July 6, 2020). In *Murray,* the Chief Special Master reasoned that petitioner should be awarded $15,000.00 more than what respondent was advocating for, but still considered that the petitioner was also recovering from a car accident at the time she experienced her SIRVA. *Murray,* at *5-6.

Respondent concludes that petitioner's course was relatively mild, as demonstrated by the long gaps in treatment and her ability to obtain relief for the first six months post-vaccination with over-the-counter medications and avoiding activity. Resp. Mem. at 4. Additionally, respondent argues that petitioner's treatment course was limited, consisting of one steroid injection and fifteen physical therapy sessions. *Id.*

## V. Appropriate Compensation for Petitioner's Pain and Suffering

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. While the parties initially disputed the onset of petitioner's injury, it does not appear that either party disputes petitioner's awareness of her left shoulder injury at this juncture.

With respect to the severity of petitioner's injury, the record supports that petitioner experienced a mild to moderate shoulder injury. Even though petitioner delayed treatment for four months, it does not necessarily provide insight as to the severity of her shoulder pain. In other SIRVA cases, petitioners delayed treatment for many different reasons, ranging from lack of primary care physician, work and school obligations, that the pain was going to resolve on its own, or managing other medical conditions simultaneously. *See Smallwood v. Sec'y of Health & Human Servs.,* No. 18-291V, 2020 2954958, at *10 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) (petitioner stating he delayed treatment because he lacked a primary care physician); *Yost v. Sec'y of Health & Human Servs.,* No 18-288V, 2021 WL 2326403, at *12 (petitioner delayed treatment for four months post-vaccination because of school and work obligations); *Desai v. Sec'y of Health & Human Servs.,* No. 14-811V, 2020 WL 491977 (Fed. Cl. Spec. Mstr. July 30,

2020) (petitioner delayed treatment for six months because she though the pain and soreness would resolve on its own); *Forman-Franco v. Sec'y of Health & Human Servs.,* No. 15-1479V, 2018 WL 1835203, at \*4 (Fed. Cl. Spec. Mstr. Feb. 21, 2018) (petitioner delayed treatment for SIRVA for four months because she was taking over the counter anti-inflammatory medication and hoping that the pain would cease."). In this case, petitioner explained that she delayed treatment for approximately two months because she thought that the pain and discomfort would resolve on its own, as it had done after receiving other vaccinations. Tr. 9-10; *see also* Pet. Ex. 6 at 5 (physical therapy record states "waited a few months thinking it would go away."). Instead, the two months between vaccination and petitioner's first doctor's appointment demonstrates that petitioner's left shoulder was consistently causing her pain and discomfort. It has been my observation in reviewing multiple SIRVA claims, beside those reported in reasoned decisions, that it is very common that petitioners defer seeking medical treatment for two or three months believing that the pain will go away and only seek care when the pain is persistent and interferes with activities of daily living.

At petitioner's first medical appointment on April 15, 2014 for her left shoulder, she still reported to her primary care physician that her left shoulder was "painful." *See* Pet. Ex. 3 at 5. Further, petitioner's medical provider recommended that petitioner take NSAIDs and take a "wait-and-see" approach before going to an orthopedist. *See* Pet. Ex. 3 at 42. Two months later, in August 2014, petitioner again messaged her primary care physician stating that "certain activities...make it hurt," and that she had been doing exercises, but had seen no change in her shoulder symptoms. *Id.* at 41. At petitioner's first orthopedic appointment, petitioner reported her left shoulder pain was about a 4-5 out of 10 and characterized it as "throbbing." Pet. Ex. 3 at 21. When petitioner presented to her first physical therapy evaluation on August 19, 2014, petitioner rated her pain as a 5 out of 10 at it's worst. Pet. Ex. 3 at 141. After seven physical therapy appointments, petitioner reported that her pain in her left shoulder had decreased (to a 2 out of 10), but she still demonstrated some difficulty with abduction. *Id.* at 159, 19. Petitioner opted to do exercises at home. Tr. 10.

Eleven months later, petitioner sought a second opinion from orthopedist Dr. Hennigan. Pet. Ex. 5 at 3. At this appointment petitioner described her left shoulder as "tight and sore." *Id.* Additionally, Dr. Hennigan noted that petitioner explained she had some improvement with conservative treatment, but wrote that "there appears to be a plateau." *Id.* at 7. Petitioner received a steroid injection later in August 2015 and then re-started physical therapy. *See* Pet. Ex. 6 at 5. At her August 31, 2015, petitioner reported that her left shoulder pain was a 7 out of 10 at its worst, but it was presently a 3 out of 10. *Id.* It was not until after this round of physical therapy that petitioner's shoulder symptoms mostly resolved.

In total, petitioner experienced approximately 18 months of documented moderate pain and suffering. Even though there was an eleven-month gap in treatment, petitioner sought a second opinion because her shoulder continued to cause her pain and limit her activities. During this period, petitioner did the prescribed home exercises for her shoulder. Petitioner initially engaged in conservative treatment, eventually received a steroid injection, and then participated in two rounds of limited physical therapy. It is unlikely that the orthopedist would have given a steroid injection or prescribed two rounds of physical therapy, or that petitioner would have undergone same if the pain was not still significantly bothersome. While the respondent cites

*Dagen, Murray,* and *Knauss,* as comparable cases to the present one, I find that the damages decision in *Sakovits* case is more helpful in determining the appropriate award for petitioner's past pain and suffering.  In *Sakovits,* the petitioner was awarded $68,000.00 in pain and suffering.  *Sakovits v. Sec'y of Health & Human Servs.,* No. 17-1028V, 2020 WL 3729420 (Fed. Cl. Spec. Mstr. June 4, 2020).  As in the present case, the petitioner in *Sakovits* delayed treatment for her left shoulder pain post-vaccination for three months and only demonstrated some limitation in range of motion.  *Sakovits,* at *3-4.  Additionally, the petitioner in *Sakovits* received a cortisone injection and attended physical therapy sessions, where petitioner showed some progress.  *Id.,* at *3-4.  However, the duration of petitioner's injury in this case is longer than the duration of the petitioner in *Sakovits,* thus justifying a higher award for pain and suffering.  Given the petitioner's duration, severity, and treatment course in this case, I find that an award of $72,000.00 in actual or past pain and suffering for her left shoulder injury is appropriate.

## VI.    Conclusion

For all of the reasons discussed above and based on consideration of the record as whole, I find that $72,000.00 represents a fair and appropriate amount of compensation to petitioner for her actual pain and suffering resulting from her shoulder pain.  I also find that petitioner is entitled to $2,011.32 for past umreimbursable medical expenses, as the parties do not contest this amount and supportive documentation of these bills was submitted.

.
Based on the record as a whole and arguments of the parties, **I award the following:**

a) **A lump sum payment of $74,011.32 ($72,000.00 representing pain and suffering and $2,011.32 in past unreimbursable expenses) in the form of a check payable to petitioner.**

**This amount represents compensation for all remaining damages that would be available under Section 15(a).**

The Clerk of the Court is directed to enter judgment in accordance with this decision.[4]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[4] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review.  Vaccine Rule 11(a).